**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MAYEVERN CASEY, | CASE NO. CV F 08-1811 LJO DLB |
| Plaintiff, | **ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT** |
| vs. | |
| METROPOLITAN LIFE INS. CO., | |
| Defendant. | |
| _____/ | |

In this action, plaintiff MayeVern Casey ("Casey") seeks to recover life insurance benefits following the death of her ex-spouse, Billy Claborn, under a group life insurance policy issued by defendant Metropolitan Life Insurance Company ("Met Life"). The parties filed cross motions for summary judgment pursuant to Fed.R.Civ.P. 56.

## FACTUAL BACKGROUND

**A. The Group Universal Life Policy**

In November of 1991, Casey was an employee of GTE, Corp. She enrolled in a Group Universal Life insurance plan provided by The Travelers Life Insurance Company ("The Travelers") for employees of GTE. At that same time, Casey elected to obtain coverage in the amount of $100,000.00 on her then-spouse, Billy Claborn, naming Casey as the beneficiary. (At that time, plaintiff's married name was MayeVern Claborn.) The Travelers provided plaintiff with a certificate of insurance which stated that it "applies only to regular Employees of GTE Corporation or one of its subsidiaries . . . It also applies

1

to the spouse of an eligible Employee." (Doc. 33, McIssac Decl. Exh. A, p. P003.) In November 1994, Casey retired from GTE after 31 years of service.[1]

When Casey retired, she discontinued her coverage under the Plan issued by The Travelers, but continued coverage under the Plan on the life of her husband, Billy Claborn. (Doc. 33, McIsaac Decl. Exh. A, Casey depo p. 16.)

In December 1996, Casey filed for divorce from Billy Claborn, and the divorce became final on July 3, 1997. Casey and Claborn executed a Marital Settlement Agreement on December 9, 1996 which became incorporated into the judgment of divorce and which awarded Casey the policy of life insurance issued by The Travelers on the life of Billy Claborn.

**B.    Notices by Met Life**

In January 1996, Met Life became the insurer of the Plan. (Doc. 29, Peterson Decl. ¶5.) In November 1996, the Plan Administrator Marsh (at that time, called Johnson & Higgins/Kirke-Van Orsdel ("J&H/KVI")), "sent all Plan participants, regardless of whether they were current, retired, or terminated GTE employees, a letter notifying them that MetLife was the new insurer of the Plan." (Doc. 29, Peterson Decl. ¶6, Exh. 1.) That November 1996 letter further notified Plan participants of changes to the Plan, including that the Plan did not cover divorced spouses:

> "Under the new MetLife provisions, an employee cannot keep Group Universal Life coverage on his or her spouse after a divorce; however, the divorced spouse may apply to continue separate coverage under the program. The employee must submit written notification of the date of divorce and the spouse's address to J&H/KVI. J&H/KVI will then mail out a Group Universal Life enrollment kit to the former spouse. If the former spouse applies within 31 days of the date the kit is mailed, he or she will receive a new certificate of insurance, and can have either an equal or lesser amount of coverage in effect at the time of the divorce."
> *Id.* (Emphasis added)

Met Life presents evidence that as a Plan participant, MayeVern Casey would have been sent this letter notification. (Doc. 29, Peterson Decl. ¶6.) Plaintiff Casey presents evidence that she did not receive this letter.

In August 1997, Casey received a letter from the Plan Administrator notifying her that the carrier

---

[1] The parties dispute whether the employment was a continuous 31 years. For purposes of this motion, this issue is immaterial because resolution does not depend upon "continuation" of employment. It is undisputed that Casey was entitled to continue coverage for Billy Claborn under the Plan after her retirement.

2

for the Plan had changed from The Travelers to Met Life. (Doc. 24, Casey Decl., Exh. D.) The August

1997 letter enclosed a new Certificate of Insurance, number 1145159, and Insurance specifications page

which indicated Met Life as the carrier, Casey as the Insured and Claborn as the covered person with a

death benefit of $100,000.00. (Doc. 24, Casey Decl. Exh. E ("Covered Person: Billy J. Claborn".))

The August 1997 letter also enclosed the Met Life insurance policy. (Doc. 24, Casey Decl. Exh. E.) The

letter stated: "The enclosed important document should be reviewed carefully and filed with your other

important papers." (Doc. 24, Casey Decl. Exh. D.) Casey states that the letter did not identify any

changes in the insurance coverage between The Travelers policy and the Met Life policy. The Met Life

policy, however, which was included with the August 1997 letter, stated on page 8 (Bates MET0008),

in part:

> 8.   <u>Termination of Marriage or Death of the Employee</u>
>
> If the spouse is the Covered Person and while the spouse is covered for an amount of Insurance:
>
> (a) the spouse's marriage to the Employee ends; or
>
> (b) the Employee dies;
>
> the spouse may make written request to remain insured under This Plan. The Death Benefit will continue if the spouse pays the Planned Contributions based on the spouse's new classification, directly to the Administrator.

(Doc. 31, Exh A, Bates MET0008.) Both parties reference the policy, which is an approximate 26-page

document. (Doc. 24, Casey Decl. ¶7, Exh. E.); (Doc. 31, Copperwheat Decl. Exh. A.)

**C.   Casey's Claim for Life Insurance Benefits**

Met Life argues that after the divorce, neither Casey nor Billy Claborn notified the administrator

or Met Life of the divorce. Met Life argues neither made a written request to the administrator or Met

Life for Billy Claborn to remain insured under the Met Life policy as an ex-spouse. (Doc. 32, MetLife

moving paper p. 9.)

Casey contacted Met Life in April 2005 to notify Met Life that Billy Claborn was now a non-

smoker. Met Life recalculated Billy Claborn's premium under the Plan for a non smoker and sent a

confirming letter to Casey. (Doc. 29, Peterson Decl. ¶7.)

In May 2006, Casey informed the claims administrator, Marsh, that the Billy Claborn had died.

Marsh forwarded the documents it had received from Casey to Met Life, which Met Life received in June 2006. Among the documents Casey submitted included plaintiff's May 26, 2006 letter wherein she stated that she had divorced Billy Claborn in 1997. Plaintiff included a copy of the divorce papers, and her enrollment form in the Group Universal Life.

By letter on June 21, 2006, Met Life notified plaintiff that her claim on the life insurance proceeds was being denied. (Doc. 31, Exh. C.) Met Life stated:

> "The divorce decree is dated April 22, 1997, and according to the Plan, any divorce enacted after 1996 required that the benefits for the spouse be terminated on the first of the month following the divorce effective date. Therefore, based upon the information we have on file, we are, at this time, denying your claim." (Doc. 31, Exh. C.)

Plaintiff appealed the denial of her claim. On July 19, 2006, plaintiff filed her appeal of Met Life's denial, stating that she had not received any documents that the Plan had been changed regarding benefits for a spouse, and that she had made premium payments for 10 years under her new married name. She asked for reconsideration of the denial. (Doc. 31, Exh. D.)

Met Life reconsidered its prior denial and asked for supplemental information. On August 10, 2006, Met Life requested a copy of plaintiff's entire divorce decree for review on appeal. (Doc. 31, Exh. E.) Casey forwarded the requested information on September 11, 2006. (Doc. 31, Exh. F.)

By letter on September 27, 2006, Met Life upheld its denial of Casey's claim. Met Life informed Casey that, "[w]e have re-examined the entire claim file, including examination of any additional material and information provided with your request for appeal. For the reasons detailed below, we must uphold the denial of this claim." (Doc. 31, Exh. G.) Met Life's letter of denial quoted the specific Plan language for "Termination of Marriage." Met Life's denial letter then explained:

> "The certificate is explicit and clear that only the spouse of the employee may elect to continue dependent spouse benefits on themselves. We have researched your policy with the administrator responsible for maintaining records for this certificate, Marsh@Work Solutions, and have found that from the time of your divorce, July 3, 1997, to the passing of the decedent, the administrator was not notified of your divorce." (Doc. 31 Exh. G.)

Met Life stated that because the Plan administrator was not notified of the divorce, "in good faith the administrator continued to accept premium[s] under the incorrect information that the decedent was still your eligible dependent spouse." Met Life stated that the "policy does not allow the employee to take

4

1  over coverage should the then ex-spouse neglect or discontinue coverage."[2]

2  Plaintiff filed her complaint alleging the following causes of action:

3  1.    Breach of Contract;

4  2.    Breach of the Covenant of Good Faith and Fair Dealing;

5  3.    Breach of Fiduciary Duties; and

6  4.    Declaratory Relief.

7  **D.    Summary of the Parties' Positions on their Motions**

8  Met Life moves for summary judgment on the following grounds:

9  1.    Plaintiff could not maintain coverage on her ex-spouse Billy Claborn following the

10     divorce;

11  2.    Plaintiff's bad faith claim is barred by the statute of limitations;

12  3.    Plaintiff's bad faith claim must be dismissed because there is a genuine dispute as to

13     coverage;

14  4.    Plaintiff cannot maintain her cause of action for breach of fiduciary duty against MetLife;

15  5.    Plaintiff's declaratory relief claim fails;

16  6.    There are no facts supporting plaintiff's assertion of punitive damages.

17  Casey moves for summary judgment on the grounds that:

18  1.    Met Life wrongly denied her claim based upon the unsupported position that Claborn

19     was not a covered person under the policy.

20  2.    Met Life was not prejudiced by any failure to be notified of the divorce of Claborn and

21     Casey because coverage would have continued and Met Life did not have the discretion

22     to cancel the policy.

23  3.    Met Life engaged in bad faith in denying the claim.

24

25
_____

26  [2] Met Life contends that the premiums in this situation would have increased. If Met Life had been notified that plaintiff and Billy Claborn that they had divorced in 1997, and that Billy wished to continue coverage, his premiums would have increased. (Doc. 32, Met Life moving papers p.14.) Met Life states that a spouse continuing coverage after a divorce,

27  pays terminated premium rate, which are higher than the retiree or active employee rates. (Doc. 33, Exh. B, Edgerton Depo. P.85:8-11.)

28

**ANALYSIS AND DISCUSSION**

**A.    Summary Judgment/Adjudication Standards**

F.R.Civ.P. 56(b) permits a "party against whom relief is sought" to seek "summary judgment on all or part of the claim." Summary judgment/adjudication is appropriate when there exists no genuine issue as to any material fact and the moving party is entitled to judgment/adjudication as a matter of law. F.R.Civ.P. 56( c); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The purpose of summary judgment/adjudication is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

On summary judgment/adjudication, a court must decide whether there is a "genuine issue as to any material fact," not weigh the evidence or determine the truth of contested matters. F.R.Civ.P. 56 ( c); *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467, 82 S.Ct. 486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir. 1984). The evidence of the party opposing summary judgment/adjudication is to be believed and all reasonable inferences that may be drawn from the facts before the court must be drawn in favor of the opposing party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986); *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252, 106 S.Ct. 2505.

To carry its burden of production on summary judgment/adjudication, a moving party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact." *Nissan Fire*, 210 F.3d at 1102. "As to materiality, the substantive law will identify which facts are material. Only disputes over

facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

"If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102-1103; *see Adickes*, 398 U.S. at 160, 90 S.Ct. 1598. "If, however, a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Nissan Fire*, 210 F.3d at 1103. "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) ("Rule 56( c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make the showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.")

"But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion." *Nissan Fire*, 210 F.3d at 1103; *see Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-289, 88 S.Ct. 1575, 1592 (1968)).

**B.     Standards for Interpreting Insurance Contracts**

California's substantive insurance law governs in this diversity case. *State Farm Mut. Auto. Ins. Co. v. Khoe*, 884 F.2d 401, 405 (9th Cir. 1989). An insurance policy is fundamentally a contract between the insurer and the insured. *Stein v. International Ins. Co.,* 217 Cal.App.3d 609, 614 (1990). It is subject to the same general principles of interpretation as any other contract. *AIU Ins. Co. v. Sup.Ct. (FMC Corp.)*, 51 Cal.3d 807, 821-822 (1990). Interpretation of clear and unambiguous provisions in a contract is a question of law for the court, allowing summary judgment/adjudication. *See United States v. Sacramento Mun. Util. Dist.*, 652 F.2d 1341, 1344 (9th Cir. 1981).

Here, neither of the parties contends that the relevant terms of the insurance contract are

1  ambiguous. Defendant notes that the policy is unambiguous. (Doc. 32, Met Life Moving Papers p.16:8.)

2  Plaintiff does not contend that the language of the insurance policy is ambiguous. (Doc. 23, Plaintiff

3  Moving papers p. 7.)  Thus, the Court's interpretation is a question of law.

4      The Court's initial focus in resolving a question of insurance coverage is always on the language

5  of the insurance policy itself: "The rules governing policy interpretation require us to look *first* to the

6  language of the contract in order to ascertain its plain meaning or the meaning a layperson would

7  ordinarily attach to it." *Waller v. Truck Ins. Exch., Inc.,* 11 Cal.4th 1, 18 (1995) (emphasis added); *see*

8  *also City of Hope Nat. Medical Center v. Genentech, Inc.,* 43 Cal.4th 375, 395, 75 Cal.Rptr.3d 333,

9  (2008) (Contract interpretation is solely a judicial function when "based on the words of the instrument

10  alone, when there is no conflict in the extrinsic evidence, or a determination was made based on

11  incompetent evidence".)  Absent evidence indicating the parties intended a special usage, words used

12  in an insurance policy should be interpreted in their "ordinary and popular sense." Cal.Civ.Code § 1644.

13  In determining whether a policy provision has a "plain meaning," it must be read in the context of the

14  entire policy: "The whole of a contract is to be taken together, so as to give effect to every part ... each

15  clause helping to interpret the other." Cal.Civ.Code § 1641.  Coverage clauses are interpreted to protect

16  the objectively reasonable expectations of the insured. *AIU Ins. Co. v. Superior Court,* 51 Cal.3d, 274

17  Cal.Rptr. 820 (1990).

18      When terms are unambiguous, California law requires that the mutual intention of the parties is

19  to be "inferred, if possible, solely from the written provisions of the contract." *MacKinnon v. Truck Ins.*

20  *Exchange*, 31 Cal.4th 635, 647-648 (2003).  The mutual intention of the contracting parties at the time

21  the contract was formed governs interpretation.  Cal. Civ. Code §1636.  "The parties' mutual intent is

22  to be determined, if semantically possible, *solely* from the written provisions of the contract." *AIU Ins.*

23  *Co. v. Sup.Ct., FMC Corp.*, 51 Cal.3d at 822; *Waller*, 11 Cal.4th at 18 (Such intent is to be inferred, if

24  possible, solely from the written provisions of the contract); *Haynes v. Farmers Ins. Exch.*, 32 Cal.4th

25  1198, 1204 (2004) (same).  Therefore, the Court turns to the language used in the Policy.

26  /////

27  /////

28  /////

**1. Applicable Policy Language**

The applicable Plan language, upon which Met Life bases its denial, is as follows:

> 8. <u>Termination of Marriage or Death of the Employee</u>
>
> If the spouse is the Covered Person and while the spouse is covered for an amount of Insurance:
>
> (a) the spouse's marriage to the Employee ends; or
>
> (b) the Employee dies;
>
> the spouse may make written request to remain insured under This Plan. The Death Benefit will continue if the spouse pays the Planned Contributions based on the spouse's new classification, directly to the Administrator.

Met Life argues that the policy did not permit plaintiff to continue coverage on her ex-spouse. Met Life argues that the language says that a spouse will not "remain insured" after divorce from an employee, unless certain conditions are met - a written request from the spouse and premium payments based on the ex-spouse's new classification. (Doc. 32, Met Life moving papers p.16.) Neither plaintiff nor the ex-spouse notified the administrator of the divorce and premiums were not paid based upon the ex-spouse's new classification.[3]

Casey's first argument in support of coverage is as follows. Casey argues that there was inadequate notice of the changes from The Travelers' policy to the Met Life policy. She contends that The Travelers policy did not contain a provision whereby the coverage of an employee's spouse is terminated upon the divorce of the employee and the spouse. (Doc. 26, Plaintiff's Undisputed Fact no.3.) Plaintiff argues that the policy provision upon which Met Life relies in denying Casey's claim - that coverage automatically terminated upon divorce - should not be enforced because this limitation was not made conspicuously clear upon the change from The Travelers to Met Life.

**2. Notice of Change in Insurance Coverage**

Casey's first argument, as to the adequacy of the notice, is a factual argument and raises a material issue of fact.

Under California law, changes to insurance coverage must be in a clear and conspicuous writing.

---

[3] The parties dispute whether the divorced status would have altered the premium amount. For purposes of resolving these motions, the amount of premium is not a material fact.

"The rule is and should be: Deletions or exclusions from a renewal group policy should be communicated and explained to the subscriber by a plain, clear and conspicuous writing." *Fields v. Blue Shield of Calif.*, 163 Cal.App.3d 583, 579, 209 Cal.Rptr. 781, 788 (1985). Merely warning each group member to "read your entire policy carefully" is not effective notice of changes in the policy involving loss of benefits. *Fields v. Blue Shield of Calif.*, 163 Cal.App.3d at 579; *Haynes v. Farmers Ins. Exch.*, 32 Cal.4th at 1211. Any notice of changes to the policy must be adequate to bring such changes to the members' attention: "(T)he notice shall describe in plain, understandable English and highlighted in italics any changes in the plan design or change in benefits ... (and) shall specify the reason or reasons for (such changes)." Ins.C. § 10199.2. The purpose to "promote the public interest, to prevent unfair and unlawful health care business practices, and to promote adequate consumer and employer advance notice of changes in the cost and benefits of health coverage in order to allow for comparative shopping and to reduce the cost of health coverage." Ins.Code, § 10199.

Casey relies upon *Fields v. Blue Shield of California*, 163 Cal.App.3d 570 for the proposition that renewal of a policy limiting coverage is ineffective where the insured is not notified of the specific reduction in coverage. In *Fields*, plaintiff's original health insurance policy covered psychotherapy, but this benefit was substantially reduced when the policy was renewed. The exclusion in the renewal policy was not contained in either section entitled "How Plan Changes" or "Exclusion," but rather the exclusion was placed in small print at the end of benefit granting provisions. The court held that failure to use clear, conspicuous and plain language in a notification of reduction in policy coverage renders the reduction ineffective. The court held that the insurer failed to notify by a "clear, conspicuous notice in an expected place that coverage he originally had was now totally withdrawn." *Id.* at 578. Therefore, the Court did not enforce the exclusion. *Id.* at 578.

Here, plaintiff argues that she did not receive the November 1996 notice Met Life sent and contends Met Life's evidence is insufficient that the notice was actually mailed to plaintiff. (Doc. 36, Plaintiff Opposition p. 6:13 ("defendant fails to allege and gives no facts supporting an allegation that the plaintiff was ever mailed this letter, nor ever received this letter.").) Plaintiff argues that the letter from Met Life that she actually received, in August 1997, did not list any exclusions or limitations related to divorce.

1    There is an issue of fact whether notice was adequate. Where there is an issue of fact as to

2    receipt or whether the notice was sent, summary judgment is improper. *See Nationwide Mutual Ins. Co.*

3    *v. Devlin,* 11 Cal.App.4th 81, 13 Cal.Rptr.2d 795 (1992) (judgment was affirmed because, among other

4    things, "no facts in the record to suggest the insured, did not receive notice of the endorsement.") The

5    adequacy of the notice and whether any notification was sent are both genuine issues of material fact

6    upon this record. *Allstate Ins. Co. v. Fibus*, 855 F.2d 660, 663 (9th Cir. 1988). Plaintiff's evidence is

7    that she did not receive the November 1996 notice of the change. Met Life does not cite to authority

8    which permits summary judgment in light of such evidence. Plaintiff also disputes that the notice was

9    sent. Indeed, the conclusory evidence by Met Life that Casey "was sent" the notice is insufficient in light

10   of the inference the Court must make in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*,

11   477 U.S. at 255 (The evidence of the party opposing summary judgment/adjudication is to be believed

12   and all reasonable inferences that may be drawn from the facts before the court must be drawn in favor

13   of the opposing party). Accordingly, plaintiff raises issues of fact as to the adequacy of notice.

14        **3.      Reduction in Coverage**

15        Further, there is an issue of whether Met Life reduced the coverage which was provided in The

16   Travelers' policy, for which Met Life was required to give notice to Casey.

17        Casey contends that the original The Travelers' policy did not terminate coverage of a spouse

18   upon the divorce of the spouse and employee. (Doc. 26, Plaintiff's Statement of Facts #3.) Casey argues

19   that under The Travelers' policy, Billy Claborn would have remained covered. Met Life objects to this

20   fact and disputes its relevance. Met Life argues that whether The Travelers' policy provided for

21   continued coverage is questionable because The Travelers' policy defined "spouse" as "an employee's

22   legal spouse." (Doc. 42, Met Life Objections p.3, Fact 3.)

23        The Court finds that this issue is material to resolution of the motions. Whether The Travelers'

24   policy contained a provision which permitted continuing coverage upon a spouse's divorce, goes to the

25   very issue of whether Met Life reduced coverage. Whether Met Life reduced coverage goes to the issue

26   of whether Met Life adequately informed Casey of the reduction in coverage. The parties cite, generally,

27   to The Travelers' policy (a 15-page document), without identifying the specific language in The

28   Travelers' policy which either supports or refutes the other party's position. (See Doc. 33, Exh. A, p.

P003-P017.) Here, Met Life arguably reduced coverage by eliminating coverage when spouses divorce. Met Life purportedly sent a notice to Casey in November 1996 notifying her that divorced spouse would not remain covered. (Doc. 29, Peterson Decl. ¶6, Exh. 1.) The Traveler's policy indeed may have provided coverage to divorced spouses because Met Life's notice was meant to comply with California law to notify insureds of reduced coverage. The inference the Court must draw is that The Traveler's policy provided continued coverage upon divorce. Accordingly, there is a material issue regarding the coverage provided by The Traveler's policy.

Interpretation of an insurance contract is generally a question of law. In this case, however, the parties did not identify the provisions upon which they rely, or refute. The Court has no obligation to search the documents submitted in support of or in opposition to a motion. *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (it is immaterial that helpful evidence may be located somewhere in the record). The Court finds that whether The Travelers' policy provided coverage as plaintiff argues, is a material issue, which cannot be adjudicated in these motions.

### 4. Language of the Policy in Section 8

Casey's second argument is that the language of the policy does not mean what Met Life has interpreted it to mean. Casey argues that the section "8. Termination of marriage or death of the Employed" has nothing to do with whether coverage is terminated upon divorce. Instead, it deals with how the premiums are to be paid upon a divorce. Section "8. Termination of marriage or death of the Employed" is contained within the section "Payment during the Covered Person Lifetime." Plaintiff argues that there is no language in "8. Termination of marriage or death of the Employee" which automatically terminates coverage upon the divorce of the employee.

The Court does not reach this issue of interpreting the policy language because of the above issues which raise issues precluding summary judgment.

### C. Claim for Breach of the Covenant of Good Faith and Fair Dealing

Plaintiff's second cause of action is for bad faith breach of the implied covenant of good faith and fair dealing.

Met Life argues that the bad faith claim is barred because the Met Life legitimately and genuinely disputed coverage. Met Life also argues that the bad faith claim fails because it is barred by

the statute of limitations.

1.    **No Issue of Fact as to Bad Faith Breach**

Met Life argues that where there is a legitimate, genuine dispute as to liability under a policy, there is no bad faith. Met Life argues that the bad faith claim should be dismissed because there is a genuine dispute as to whether Casey was covered in this circumstance. Met Life's position is that coverage for an ex-spouse could only be continued if notice was provided to the administrator and additional premiums were paid. (Doc. 32, Met Life moving papers p. 18-19.)

The implied covenant of good faith and fair dealing in first party cases obligates the insurer:(1)to make a thorough and prompt investigation of the insured's claim for benefits; and (2) not to unreasonably delay or withhold payment of benefits. *See Silberg v. California Life Ins. Co.*, 11 Cal.3d 452, 461–462, 113 Cal.Rptr. 711, 717 (1974).

The implied covenant of good faith and fair dealing is breached where an insurer delays or denies payment of policy benefits unreasonably (i.e., without any reasonable basis for its position) or without proper cause. *Jordan v. Allstate Ins. Co.*, 148 Cal.App.4th 1062, 1072–1073, 56 Cal.Rptr.3d 312, 319 (2007); *see Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713, 723, 68 Cal.Rptr.3d 746, 754 (2007) ("[A]n insurer's denial of or delay in paying benefits gives rise to tort damages only if the insured shows the denial or delay was unreasonable"). Claims mishandling is "precisely the kind of bad faith behavior that goes to the heart of the special insurance relationship and gives rise to tort remedies." *Jonathan Neil & Assocs., Inc. v. Jones*, 33 Cal.4th 917, 940, 16 Cal.Rptr.3d 849, 867 (2004).

Under California law, bad faith liability does not exist for a legitimate dispute of an insurer's liability under the policy. *Chateau Chamberay Homeowners Ass'n v. Associated Intern.*, 90 Cal.App.4th 335, 346,108 Cal.Rptr.2d 776 (2001). "[W]here there is a genuine issue as to the insurer's liability under the policy for the claim asserted by the insured, there can be no bad faith liability imposed on the insurer for advancing its side of that dispute." *Id.* at 347. A genuine dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds. *Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713, 723, 68 Cal.Rptr.3d 746, 754 (2007). "[A]n insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it

13

might be liable for breach of contract." *Wilson v. 21st Century Ins. Co.* 42 Cal.4th at 723. This "genuine dispute" or "genuine issue" rule was originally invoked in cases involving disputes over policy interpretation, but in recent years courts have applied it to factual disputes as well. *Wilson v. 21st Century Ins. Co.*, 42 Cal.4th at 723.

Whether a "legitimate, genuine" dispute exists may be decided as a matter of law. "[A] court can conclude as a matter of law that an insurer's denial of a claim is not unreasonable, so long as there existed a genuine issue as to the insurer's liability." *Chateau Chamberay Homeowners,* 90 Cal.App.4th at 346. An insurer is entitled to summary judgment based on a genuine dispute over coverage or the value of the insured's claim only where the summary judgment record demonstrates the absence of triable issues as to whether the disputed position upon which the insurer denied the claim was reached reasonably and in good faith. *Wilson v. 21st Century Ins. Co.*, 42 Cal.4th at 724. In *Wilson*, plaintiff had suffered neck injuries in a car accident and submitted an insurance claim. The defendant insurance company rejected her claim, on the grounds it was a preexisting injury. Before rejecting the claim, the insurance company did not attempt to contact the plaintiff's doctor or speak with any other medical practitioner about the claim. Because the dispute was as to liability on a factual dispute--not a dispute as to policy interpretation--the *Wilson* court found that, without investigation, the dispute was not "genuine," and the insurance company did not have a reasonable factual basis to deny the claim. See id. at 724-26. The Court denied summary judgment.

Where the reasonableness and genuineness of the insurer's decision, however, depends entirely on analysis of legal precedent and statutory language, the issue is one of law to be decided by the trial court. *Chateau Chamberay Homeowners*, 90 Cal.App.4th at 348 n.7. A coverage dispute involving the proper construction and application of policy language would be a legal dispute, while one involving a disagreement as to the reasonable value of an insured's claim would be a factual one. Provided there is no dispute as to the underlying facts (e.g., what the parties did and said), then the trial court can determine, as a matter of law, whether such dispute is "genuine." *Id.*

Here, the dispute is over the contract interpretation of the insurance provision regarding coverage. The issue is whether the Plan provision, "8. Termination of Marriage or Death of the Employee," provided coverage following the divorce. Met Life says the provision applies to the facts of the case.

14

1  Plaintiff says the provision does not apply.  Thus, there is a legitimate, genuine dispute as to whether the

2  provision applies.   Both positions are reasonable.  Met Life, for its part, states that the plain language

3  of the Plan provision does not provide coverage.  Casey, for her part, argues that she did not receive

4  notice of the Plan provision.  Whether or not plaintiff actually received notice is irrelevant to the

5  "genuineness and reasonableness" of Met Life's position.  Met Life denied the claim by relying upon

6  the Plan provision, "8. Termination of Marriage or Death of the Employee."  The evidence shows the

7  position was reached reasonably and in good faith.

8          Plaintiff argues that she has raised an issue of fact.  She presents evidence that Met Life quoted

9  the incorrect policy language, its own policy as opposed to the Traveler's policy, as part of its practice

10  to deny coverage to a spouse of an employee.  She appealed, stating she had not received the notice of

11  change of plan, but instead of investigating the different policy languages between Met Life and the

12  original Traveler's policy,[4] Met Life denied the claim again.  (Doc. 36, Casey Opposition p.9.)  Plaintiff

13  argues that Met Life gave first erroneous then contradictory rationales for denying her claim. (Doc.36

14  Casey Opposition p.9.)  She argues this raises an issue of fact.

15          Here, plaintiff does not raise an issue of fact that Met Life failed to maintain in good faith and

16  on reasonable grounds its position that the Plan precluded coverage.  There is no evidence that plaintiff

17  informed Met Life of the change of marital status.  She argues that she made premium payments in her

18  new married name, but that evidence alone does not establish that Met Life acted in bad faith by

19  continuing the coverage.  There is no evidence that Casey affirmatively told Met Life of the divorce at

20  any time prior to Billy Claborn's death.[5]

21          The evidence shows that Met Life processed her claim and acted upon the information that she

22  had been divorced from the decedent. Met Life requested additional information and interpreted its Plan

23  provision as denying coverage.  While plaintiff disagrees with Met Life's conclusion, her evidence does

24  not raise an issue of fact that Met Life failed to act in good faith and on reasonable grounds.

25

26      [4] Plaintiff states that Met Life did not investigate the Traveler's policy but fails to identify any evidence in support
    of this statement.

27      [5] The parties dispute whether Casey was deliberately untruthful in not informing Met Life of the divorce.  The Court
    does not reach this issue of credibility because it is unnecessary to do so.  Indeed, issues of credibility should be left to the
28  jury. *Lowe v. City of Monrovia*, 775 F.2d 998, 1008 (9th Cir. 1985).

1        **2.      Statute of Limitations**

2        Met Life also argues that the second cause of action for breach of the covenant of good faith and

3    fair dealing is barred by the statute of limitations.  Met Life argues that it denied coverage on June 21,

4    2006.  Plaintiff appealed the decision, and Met Life upheld its denial on September 27, 2006.  Plaintiff's

5    action was not filed until October 1, 2008, more than two years for Met Life's final denial of her claim.

6    Plaintiff argues that the statute of limitations did not start on this date because she reappealed and the

7    parties continued to dispute the claim.  She also argues that Met Life failed to notify her that it had made

8    its "final" decision.

9        Breach of implied covenant actions are subject to the 2–year statute applicable to tort actions

10    generally rather than the statutes applicable to actions for personal injury or to recover penalties or

11    forfeitures.  Code Civ.Proc. § 339 (1); *Richardson v. Allstate Ins. Co.*, 117 Cal.App.3d 8, 13, 172

12    Cal.Rptr. 423 (1981).  An insured electing to proceed in tort is burdened with a shorter statute of

13    limitations (2 years), whereas a longer statute (4 years) governs contract actions.  *Archdale v. American*

14    *Int'l Specialty Lines Ins. Co.*, 154 Cal.App.4th 499, 467, 64 Cal.Rptr.3d 632, 647 fn. 19 (2007).  The

15    cause of action accrues whenever the insurer unreasonably withholds policy benefits due the insured by

16    formally denying the claim.  *See Frazier v. Metropolitan Life Ins. Co.*, 169 Cal.App.3d 90, 103–104, 214

17    Cal.Rptr. 883, 890 (1985).

18        The Court declines to reach the issue of the statute of limitations.  The Court has found that

19    Casey failed to raise an issue of material fact as to the bad faith breach of the covenant.  Therefore, the

20    Court need not decide the statute of limitations issue for the same cause of action.

21    **D.      Claim for Breach of Fiduciary Duty**

22        Plaintiff's third cause of action is for breach of fiduciary duty.  The relevant allegations are as

23    follows:

24        33.      At all times herein relevant, defendants assumed or acquired a special relationship with

25                plaintiff and owed fiduciary duties to plaintiff.

26        34.      Defendant's conduct alleged in this action constitutes breaches of the fiduciary duties

27                owed by defendants to plaintiff.

28        35.      As a direct and proximate result of the conduct of defendants, plaintiff has been damaged

16

1        . . . (Doc. 1, ¶¶33-35.)

2        Under California law, an insurer is not a fiduciary for its insured in the traditional sense and

3    cannot be held liable for breach of fiduciary duties. *Vu v. Prudential Prop. & Cas. Ins. Co.*, 26 Cal.4th

4    1142, 1150–1151, 113 Cal.Rptr.2d 70, 76–77 (2001). The insurer-insured relationship is not a true

5    "fiduciary relationship" in the same sense as the relationship between trustee and beneficiary, or attorney

6    and client. *Id.* In California, there are two lines of cases as to whether the "special and heightened

7    duties" owed by insurers to insureds are any different than the duty of good faith and fair dealing. In one

8    line of cases, such as *Frommoethelydo v. Fire Ins. Exch.,*42 Cal.3d 208, 219, 228 Cal.Rptr. 160, 166

9    (1986) , the court held that duty to investigate insurance claims states might be based "(either) on the

10   implied covenant, (or) fiduciary duty, or the duty to engage in fair practices ... " In another line of cases,

11   the courts state the "breach of fiduciary duty" means the same as breach of the implied covenant of good

12   faith and fair dealing. *See Tran v. Farmers Group, Inc.*, 104 Cal.App.4th 1202, 1212, 128 Cal.Rptr.2d

13   728 735 (2002) (breach of its 'fiduciary-like duties' is adequately redressed by a claim for breach of the

14   covenant of good faith and fair dealing"); *see* Croskey, Heeseman, Popik and Imre, *California

15   Prac.Guide: Insurance Litigation* §11:154 (The Rutter Group 2009) *and Butler v. Clarendon America

16   Ins. Co.*, 494 F.Supp.2d 1112, 1136 (N.D.Cal. 2007) (finding that the "sounder approach" is for courts

17   to analyze an insurer's alleged breach of its "fiduciary-like duties" as a claim for breach of the covenant

18   of good faith and fair dealing.)

19       Here, the Court adopts the sounder approach that a breach of fiduciary duties is analyzed under

20   the covenant of good faith and fair dealing. Thus, a separate claim does not exist for breach of a

21   fiduciary duty. *See also Solomon v. North American Life & Cas. Ins. Co.*, 151 F.3d 1132, 1138 (9th

22   Cir.1998) (holding that while the insurer-insured relationship is fiduciary in nature, it does not provide

23   for an independent action for common law breach of fiduciary duty). Summary adjudication as to this

24   claim is appropriate.

25   **E.      The Claim for Punitive Damages**

26       Met Life argues that there are no facts to support plaintiff's claim for punitive damages. Met Life

27   argues that neither negligent claims handling practices nor a violation of the duty of good faith and fair

28   dealing rises to "malice, oppression or fraud" to warrant punitive damages, citing *Stewart v. Truck Ins.*

17

1  *Exchange*, 17 Cal.App. 4th 468, 482 (1993).

2  Plaintiff argues that there is a genuine issue of material fact as to plaintiff's bad faith claim.

3  Plaintiff does not present evidence directly related to the punitive damages claim. Plaintiff does not

4  argue the issue of punitive damages in her opposition. (Doc. 36, Casey Opposition.) At best, she argues

5  that the claims procedure was in bad faith. She does not argue that the claims procedure was conducted

6  with "malice, oppression or fraud."

7  Here, the Court has found that there is no issue of fact on the cause of action for bad faith breach

8  of the covenant of good faith and fair dealing. This cause of action is the sole claim upon which punitive

9  damages is based. Therefore, the claims for punitive damages also fails.

10  Assuming, however, that the bad faith clam would have survived this motion, the Court considers

11  whether the punitive damages claim must nonetheless be dismissed.

12  California Civil Code section 3294 ("section 3294") provides that in an action "for breach of an

13  obligation not arising from contract," a plaintiff may seek punitive damages "where it is proven by clear

14  and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ.

15  Code, § 3294(a). Clear and convincing evidence has to be "so clear as to leave no substantial doubt

16  [and] sufficiently strong to command the unhesitating assent of every reasonable mind.*" In re Angelia*

17  *P.*, 28 Cal.3d 908, 919, 171 Cal.Rptr. 637(1981).

18  "Evidence that an insurer has violated its duty of good faith and fair dealing does not thereby

19  establish that it has acted with the requisite malice, oppression or fraud to justify an award of punitive

20  damages." *Mock v. Michigan Millers Mutual Ins. Co.*, 4 Cal.App.4th 306, 328, 5 Cal.Rptr.2d 594

21  (1992). An insurer's "inept and negligent handling of a claim" does not support a punitive damages

22  claim. *Patrick v. Maryland Casualty Co.*, 217 Cal.App.3d 1566, 1576, 267 Cal.Rptr. 24 (1990). A

23  mistake of law by an insurance company, an honest error of judgment, overzealousness, or negligence

24  cannot support punitive damages. *Tomaselli v. Transamerica Ins. Co.*, 25 Cal.App.4th 1269, 1288, 31

25  Cal.Rptr.2d 433 (1994) (poor claims handling does not warrant need "to punish for the maintenance of

26  evil policies which damage the public in general").

27  "Under California law, punitive damages are not available for breaches of contract no matter how

28  gross or willful." *Tibbs v. Great American Ins. Co.*, 755 F.2d 1370, 1375 (9th Cir. 1985). "Although a

18

bad faith refusal to defend may constitute a breach of the implied covenant . . ., bad faith does not necessarily indicate the presence of malice, oppression or fraud." *Tibbs*, 755 F.2d at 1375 (citations omitted). "There must be substantial evidence of intent to vex, injure and annoy, a conscious disregard of plaintiff's rights, before punitive damages may be awarded." *Betts v. Allstate Insurance Co.*, 154 Cal.App.3d 688, 709, 201 Cal.Rptr. 528, 540 (1984).

Section 3294(c)(1)–(3) defines:

1.    "Malice" as "conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights and safety of others";

2.    "Oppression" as "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights"; and

3.    "Fraud" as "an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury."

"'Despicable conduct" is conduct which is so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people." *Mock v. Michigan Millers Mutual Ins. Co.*, 4 Cal.App.4th 306, 331, 5 Cal.Rptr.2d 594 (1992). "Such conduct has been described as "[having] the character of outrage frequently associated with crime.'" *Tomaselli*, 25 Cal.App.4th at 1287, 31 Cal.Rptr.2d 433 (quoting *Taylor v. Superior Court,* 24 Cal.3d 890, 894, 157 Cal.Rptr. 693, 598 P.2d 854 (1979).

Here, there is an absence of evidence to support a claim for punitive damages. Plaintiff relies upon the "bad faith" of Met Life in denying her claim. But as shown above, a legitimate, genuine dispute existed as to coverage. Plaintiff did not introduce any evidence of other "bad faith." Further, plaintiff did not introduce any evidence, much less clear and convincing evidence, of conduct which is despicable or malicious. The evidence demonstrates correspondence between the parties which deals with the claim and processing. There is evidence that Met Life accepted premium payments for 10 years, and denied the claim, but it is undisputed that Casey did not inform Met Life of her divorce. Accepting premium payments under that circumstance is not despicable conduct. No evidence shows conduct

19

which rises to the level of despicable or malicious. Accordingly, even had the bad faith claim survived, the punitive damages claims would be dismissed for an absence of evidence to support the claim.

**F.      Cause of Action for Declaratory Relief**

Plaintiff's fourth cause of action is for declaratory relief for the parties' rights and duties under the contract. The Court has found a factual issue for the cause of action for breach of contract. Declaratory relief based upon that same cause of action, therefore, also raises an issue of fact.

<strong><u>CONCLUSION</u></strong>

For the foregoing reasons, this Court Orders as follows on cross motions for summary judgment, or in the alternative, summary adjudication by Plaintiff MayeVern Casey and Defendant Metropolitan Life Insurance Company:

1.      DENIES the motions on the first cause of action for Breach of Contract;

2.      GRANTS Metropolitan Life's motion on the second cause of action for Breach of the Covenant of Good Faith and Fair Dealing;

3.      GRANTS Metropolitan Life's motion on the third cause of action for Breach of Fiduciary Duties;

4.      DENIES the motions on the fourth cause of action for Declaratory Relief; and

5.      STRIKES the claim for punitive damages.

IT IS SO ORDERED.

**Dated:      February 23, 2010**                    **/s/ Lawrence J. O'Neill**
UNITED STATES DISTRICT JUDGE